```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Susan Boltz-Rubinstein,          :    CIVIL ACTION
                                 :    NO. 19-4628
          Appellant,             :
                                 :
     v.                          :
                                 :
Bank of America, N.A.,           :
                                 :
          Appellee.              :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          January 13, 2021

## I.   INTRODUCTION

This is an appeal from a bankruptcy case before Judge Eric L. Frank in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"). Appellant Susan Boltz-Rubinstein ("Boltz-Rubinstein") contended that Appellee Bank of America, N.A. ("BANA") committed a willful violation of an automatic stay by sending her a pre-foreclosure notice. The Bankruptcy Court found that BANA did not violate the stay because it was acting as an agent for another entity, National Residential Assets Corporation ("NRAC"), which had obtained relief from the stay before BANA sent the pre-foreclosure notice to Boltz-Rubinstein. Alternatively, the Bankruptcy Court found that even if BANA was not NRAC's agent,

Boltz-Rubinstein could not obtain relief because she suffered no proximately caused damages.

On appeal, Boltz-Rubinstein makes two main arguments: (1) that the Bankruptcy Court erred in finding an agency relationship between NRAC and BANA (which includes the analysis that Boltz-Rubinstein refers to as reverse veil piercing), and (2) that the Bankruptcy Court erred in finding that she did not suffer any proximately caused damages. The Court will affirm Judge Frank's agency finding that BANA was acting as an agent for NRAC based on the conduct between BANA and NRAC inter se because this finding was not clearly erroneous. The Court will decline to rule on the issue of damages as this was an alternative basis for the decision in this case.

II. **FACTUAL/PROCEDURAL BACKGROUND**

On November 15, 2005, Boltz-Rubinstein obtained a $593,334 mortgage loan ("the Loan") from BANA and executed a Note in favor of BANA (the "Note"). The Loan was secured by a Mortgage (the "Mortgage") on a piece of real estate located at 3444 Wiltshire Road, Furlong, Pennsylvania (the "Mortgaged Property"). In early November of 2005, prior to the issuance of the Loan, the Bank of New York Mellon ("BNYM") and BANA entered into a Servicing Agreement by which BANA was to service various loans that BANA transferred to BNYM. The Servicing Agreement permitted BANA to "effectuate foreclosure or other conversion of

2

the ownership of the Mortgaged Property securing any Mortgage Loan it services." Appellant's Br. 7, ECF No. 5.

On January 27, 2006, BANA sold the Loan to BNYM. On February 8, 2010, the Servicing Agreement was amended by letter (the "Servicing Amendment") to provide that "[i]f title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of 'National Residential Assets Corp.' unless Servicer [BANA] is directed otherwise by Owner [BNYM]." Id. at 8. BANA and BNYM signed the Servicing Amendment.

On August 3, 2010, Boltz-Rubinstein filed a Chapter 13 bankruptcy petition. The petition triggered an automatic stay pursuant to 11 U.S.C. § 362 of all debt collection against Boltz-Rubinstein. On December 10, 2010, BANA assigned the Mortgage to NRAC, and the assignment was recorded on January 10, 2011. On March 21, 2011, BANA filed a Proof of Claim[1] in Boltz-Rubinstein's bankruptcy case. The Proof of Claim identified NRAC as the creditor and BANA as the servicing agent for NRAC, and attached the Assignment of Mortgage from BANA to NRAC.

---

[1] Technically it was BAC North America Holding Company ("BACNAH") that filed the Proof of Claim, but the facts herein substitute BANA for BACNAH for the sake of simplicity since BANA is wholly owned by BACNAH. For context, BACNAH is a direct, wholly owned subsidiary of NB Holdings Corporation, and NB Holdings is a direct, wholly owned subsidiary of Bank of America Corporation.

Over the next five years, Boltz-Rubinstein failed to make more than $115,000 in post-petition payments owed under the Note. On May 4, 2016, NRAC filed a motion for relief from the automatic stay in order to begin foreclosure proceedings against the Mortgaged Property. Boltz-Rubinstein opposed NRAC's motion.

On June 23, 2016, a hearing was held on NRAC's motion for relief. Boltz-Rubinstein appeared pro se at the hearing.[2] During the hearing, counsel for NRAC represented that BANA was the loan servicer for NRAC. The same day, the Bankruptcy Court granted NRAC's motion for relief from the automatic stay. The Stay Relief Order, however, did not mention BANA.

Shortly following the lifting of the stay, BANA sent Boltz-Rubinstein six communications related to the Loan: two letters informing her that BANA is the servicer of the Loan for which BNYM is the investor/owner; an Act 91 notice;[3] and three letters regarding loan assistance options. Boltz-Rubinstein's bankruptcy case was discharged in September 2016.

In 2019, Boltz-Rubinstein brought an adversary proceeding in the Bankruptcy Court under 11 U.S.C. § 362(k),[4] contending

---

[2]   Boltz-Rubinstein is represented by counsel in this appeal.
[3]   An Act 91 notice is simply a notice that Pennsylvania law requires mortgage lenders to send to homeowners facing foreclosure. As Judge Frank notes, it is sent "as a prelude to foreclosure [and] is clearly an act to collect a debt." Appellant's Br. App. Volume 1, at 17:20-21, ECF No. 5.
[4]   11 U.S.C. § 362(k)(1) provides that "[e]xcept as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

4

that BANA violated the automatic stay by sending the pre-foreclosure notice because BANA does not have an agency relationship with NRAC, the relief from stay beneficiary. Boltz-Rubinstein was seeking both lost wages and emotional distress damages.

The Bankruptcy Court found after notice and hearing, largely based on testimony from Ann Golio, the Vice President of mortgage accounting at BNYM and President of NRAC, that: 1) NRAC is a wholly-owned subsidiary of BNYM, Appellant's Br. App. Volume 1, at 13:11, ECF No. 5; 2) NRAC "was supposed to be a paper company that would hold title to foreclosed real estate until it could be sold. It was not supposed to hold mortgages or receive payments from servicers," id. at 15:2-5; and 3) although this was the intended role, this is not how NRAC operated in practice. The Bankruptcy Court explained that

> [i]n actuality, mortgage originators like Bank of America made mortgage loans, then sold the loans to Bank of New York Mellon. Bank of America retained ownership of the mortgage and acted as servicer for the mortgage, paying monthly proceeds to Bank of New York Mellon, but if the mortgage went into default, Bank of America would assign the mortgage to NRAC, in some cases, file a foreclosure action, as NRAC's agent, and proceed through the execution and sale process in foreclosure. The end result of this was that NRAC only held mortgages, typically, for a short period of time before they were foreclosed upon and then quickly obtained title to the real property at a sheriff's sale; however, sometimes, the process did not move along smoothly and quickly and a mortgage ended up being held by NRAC for a substantial period of time. This case is an example of that.

5

Id. at 15:10-18.

The Bankruptcy Court found that BANA acted as an agent of NRAC through the above-described conduct. Accordingly, Judge Frank found that BANA, as agent, did not commit a willful violation of the automatic stay by sending a pre-foreclosure notice since NRAC, the principal, had obtained relief from the automatic stay. Judge Frank also found that agency had been established through the alternative theories of estoppel and domination. Finally, also in the alternative, he found that even if BANA was not NRAC's agent, Boltz-Rubinstein could not obtain relief because she suffered no proximately caused damages.

On appeal, Boltz-Rubinstein argues the Bankruptcy Court erred in (1) finding an agency relationship between BANA and NRAC and (2) finding that she did not suffer any proximately caused damages.

### III. LEGAL STANDARD

In reviewing an appeal from a bankruptcy court decision, this Court "applies a clearly erroneous standard to findings of fact, conducts plenary review of conclusions of law, and must break down mixed question[s] of law and fact, applying the appropriate standard to each component." In re Li, 249 B.R. 388, 389-90 (E.D. Pa. 2000) (quoting Meridian Bank v. Alten, 958 F.2d 1226, 1229 (3d Cir. 1992)). Under the clearly erroneous standard

6

of review, the bankruptcy court's findings of fact will not be disturbed unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." See United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948); see also In re DeVal Corp., 601 B.R. 725, 734 (E.D. Pa. 2019) (court can overturn findings of fact only if they "(1) [are] completely devoid of minimum evidentiary support displaying some hue of credibility or (2) bear[] no rational relationship to the supportive evidentiary data." (quoting In re Diloreto, 442 B.R. 373, 375 (E.D. Pa. 2010))).

For final, mixed questions of law and fact, the standard of review depends on "whether answering [the question] entails primarily legal or factual work." U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC, 138 S. Ct. 960, 967 (2018). Appellate courts apply "deference" to the trial court when deciding mixed questions that "immerse courts in case-specific factual issues – compelling them to marshal and weigh evidence" and "make credibility judgments." Id. (citing Pierce v. Underwood, 487 U.S. 552, 561-62 (1988)). When the trial court "takes a raft of case-specific historical facts, considers them as a whole," and "balances them one against another," the court's determination is subject to the clear error standard. See id. at 968. Such an "inquiry . . . (primarily) belongs[] in the court that has presided over the

presentation of evidence, that has heard all the witnesses, and that has both the closest and the deepest understanding of the record – i.e., the bankruptcy court." Id.

Here, only the standard for the final, mixed questions of law and fact in this case is contested. Boltz-Rubinstein contends a de novo standard should be used, while BANA contends a clear error standard should be used.

The Bankruptcy Court's agency finding (which included the analysis that Boltz-Rubinstein refers to as reverse veil piercing) was based largely on the testimony of Ms. Golio, a key witness whose testimony the Bankruptcy Court found to be credible. See Appellant's Br. App. Volume 1, at 22:16-20, ECF No. 5 ("Golio's description of the NRAC business model, actual operations, and interactions with Bank of America has persuaded me that NRAC entered into a servicer-agency relationship with Bank of America by their conduct."); see also E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 198-99 (3d Cir. 2001) (recognizing that the existence of an agency relationship is a "fact-intensive inquiry" to be decided by the trial court). Consequently, the final mixed question of law and fact at issue in this case concerning agency was primarily a factual inquiry and will be reviewed under a clear error standard. The Court need not determine the appropriate legal standard for the remaining mixed

8

questions of law and fact because they were alternative rulings and the Court declines to rule on them for the reasons explained below.

**IV. DISCUSSION**

    **A. The Agency Relationship Between NRAC and BANA**

The Bankruptcy Court held that an agency relationship existed between NRAC and BANA on three separate grounds: conduct, estoppel, and domination.

As to conduct, there are three elements under Pennsylvania law[5] that courts look to in determining whether an agency relationship exists: (1) "the manifestation by the principal that the agent shall act for him," (2) "the agent's acceptance of the undertaking," and (3) "the understanding of the parties that the principal is to be in control of the undertaking." Basile v. H&R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000) (quoting Scott v. Purcell, 415 A.2d 56, 50 (1980)).

---

[5] Ordinary state law principles of agency apply "unless, in the appropriate case, the rules of agency are superceded or modified by the Bankruptcy Code or an order of the Bankruptcy Court." See In re Mushroom Transp. Co., 282 B.R. 805, 821-22 (E.D. Pa. 2002) (Robreno, J.) (citing Strang v. Bradner, 114 U.S. 555, 560 (1885)), aff'd in part, rev'd in part on other grounds, 382 F.3d 325 (3d Cir. 2004). "Nothing in the Bankruptcy Code nor the Bankruptcy Rules overrides the law of agency" and the well settled elements needed for an agency relationship to exist. See id. at 822 n.15. In this case, Pennsylvania agency law seems to apply. As Judge Frank explained, Boltz-Rubinstein and BANA "have not stated which jurisdiction's law should apply here. They generally cite Pennsylvania law, so I follow their lead. Since the legal principles of agency from the common law are similar to the law of virtually any relevant state, this decision does not have much impact on the case." Appellant's Br. App. Volume 1, at 22:23-23:3, ECF No. 5.

9

However, it is well settled that "[i]t is not necessary that the parties explicitly state their intention to create an agency relationship." Goodway Mktg., Inc. v. Faulkner Advert. Assocs., Inc., 545 F. Supp. 263, 267 (E.D. Pa. 1982) (citing Brock v. Real Estate-Land Title & Tr. Co., 178 A. 146 (1935)). "In establishing agency, one need not furnish direct proof of specific authority, provided it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed. Moreover, existence of the relationship may be found in acquiescence or failure to disavow." Commonwealth v. Makler, 716 A.2d 619, 623 (Pa. Super Ct. 1998); see also Yezbak v. Croce, 88 A.2d 80, 82 (Pa. 1952) ("[T]he existence of an agency does not need to be established by evidence of specific authority but may be implied from all the attending circumstances."); 51 I&N, Inc. v. Rosen, 24 Phila. Co. Rptr. 98, 103-04 (Ct. Com. Pl. 1992) (agency relationship existed where principal was "well aware" that the individual was the "de facto agent" and "[principal's] acquiescence can certainly be inferred from this knowledge and continued failure to object").

Boltz-Rubinstein argues that none of the three agency elements have been met in this case and that BNYM's ownership of the Loan undermines the agency relationship between BANA and NRAC. These arguments will be addressed in turn.

10

### 1. Manifestation by NRAC that BANA shall act for it

Boltz-Rubinstein argues that there was no manifestation by NRAC that BANA shall act for it because (1) BANA was not mentioned in NRAC's motion to lift the stay, (2) NRAC doesn't do anything; and (3) the Servicing Agreement/Amendment, neither of which NRAC signed, make clear that BANA and BNYM were in an agency relationship, rather than BANA and NRAC.

Boltz-Rubinstein's arguments are unpersuasive. First, although BANA was not mentioned in NRAC's written motion to obtain relief from the stay, at the hearing on NRAC's motion to lift the stay, counsel for NRAC pointed out that BANA was the servicer for NRAC. Second, Boltz-Rubinstein does not cite any authority to support the contention that NRAC cannot assent to an agency relationship merely because it is a holding company that is not actively engaged in servicing and foreclosure. Third, whether or not BANA and BNYM were in an agency relationship and whether or not NRAC signed the Servicing Agreement/Amendment is not relevant to whether NRAC and BANA were in an agency relationship. Boltz-Rubinstein cites no authority to show that an agent cannot have more than one principal or that a written agreement signed by the principal is necessary to create an agency relationship.

Here, Judge Frank found (through the credible testimony of Ms. Golio, the President of NRAC) that although NRAC's role was

11

intended to be limited to holding title to foreclosed real estate until it could be sold, this is not what occurred in practice. In practice, BANA would assign defaulted mortgages to NRAC, and if NRAC held the mortgage for a substantial period of time, NRAC expected BANA to file a foreclosure action as NRAC's agent and proceed through the execution and sale process in foreclosure. This case is an example of that.[6] Judge Frank also found the following:

> Ann Golio also credibly testified that roughly the same process occurred for other mortgages held by NRAC. If Bank of America was still servicing them for Bank of New York Mellon at the time they were assigned to NRAC, Bank of America would continue servicing the mortgages for NRAC. While Golio's testimony did not state how many mortgages were assigned to NRAC and continuously serviced by Bank of America, it was clear from her testimony that this had occurred a number of times with some defaults eventually leading to foreclosure performed by Bank of America in NRAC's name.[7]

Appellant's Br. App. Volume 1, at 25:20-26:5, ECF No. 5.

NRAC's representation by counsel at the hearing on the motion to lift the stay that BANA was going to be its servicer,

---

[6] Judge Frank found that NRAC recorded the assigned mortgage from BANA on January 10, 2011. Foreclosure has still not occurred, and BANA has been servicing the mortgage for NRAC for a decade now.

[7] Boltz-Rubinstein's Reply Brief asserts that the claim that BANA has obtained foreclosure title for NRAC several times in the past is unsubstantiated because there has been no documented evidence presented of this. But Boltz-Rubinstein offers no authority for the proposition that Judge Frank could not make this finding of fact based on credible testimony alone. Boltz-Rubinstein also argues that BANA's assertion that it sought to obtain foreclosure in the name of NRAC contradicts the existence of an agency relationship between the two parties. The Court does not find such an act to be contradictory of an agency relationship.

12

coupled with Ms. Golio's testimony about NRAC's expectations and the course of dealing between the parties, demonstrates a manifestation by NRAC that BANA would act for it.

### 2. BANA's acceptance of the undertaking

Boltz-Rubinstein argues that "BANA completely failed to marshal any BANA employee witness to support the acceptance of the undertaking" and again reiterates that BANA was not mentioned in NRAC's motion to lift the stay or the resulting Stay Relief Order. Appellant's Br. 29, ECF No. 5. However, Boltz-Rubinstein cites no authority for the proposition that BANA was required to produce a BANA employee at trial in order to show its acceptance of the undertaking.

Here, BANA's acceptance of the undertaking is demonstrated by Ms. Golio's testimony outlined above concerning the course of dealing between BANA and NRAC. See supra Section IV.A.1. BANA's acceptance may be implied through Ms. Golio's testimony concerning BANA's actions over the years, such as the multiple cases in which BANA took steps to obtain foreclosure title for NRAC, including by proceeding with foreclosure actions in NRAC's name and taking other steps on NRAC's behalf. BANA's understanding that it was NRAC's agent is further confirmed in this case by the filing of a Proof of Claim by BANA, see supra note 1 and accompanying text, identifying BANA as NRAC's

13

servicing agent.[8] This activity, coupled with the course of dealing described above, is sufficient to show that BANA believed it was an agent for NRAC. See Scott v. Purcell, 399 A.2d 1088, 1093 (Pa. Super. Ct. 1979) (agency relationship existed where agent's "activities . . . strongly suggest that he was acting as [principal's] agent").

        3. <u>Understanding of the parties concerning control</u>

Boltz-Rubinstein argues that an understanding of the parties that NRAC was to be in control of the undertaking was not demonstrated because Ms. Golio testified as follows: (1) BANA does not have a servicing agreement with NRAC; (2) NRAC did not directly give authority to BANA to proceed through foreclosure on its behalf; and (3) BANA does not communicate with NRAC before taking action involving servicing or foreclosure.

These arguments are also unpersuasive. Boltz-Rubinstein cites no authority for the proposition that a principal must provide an express agreement or direct communications or even provide direct authority. As explained above, an

---

[8] Boltz-Rubinstein's Reply Brief argues that BANA could not have confirmed an understanding that it was NRAC's agent through its own filing which included no evident participation by NRAC. But the entire point of the second prong is to demonstrate the agent's understanding, not the principal's understanding, so there is no need for NRAC to have participated in order to show an understanding on the part of BANA.

14

implicit/indirect agency relationship may be inferred through the parties' activities and course of dealing.

Here, regardless of whether NRAC and BANA ever expressly communicated to each other the nature of their relationship, or whether NRAC ever explicitly gave authority to BANA to foreclose on its behalf, Ms. Golio's testimony above, see supra Section IV.A.1, demonstrates an implied understanding between the parties that when BANA assigned mortgages to NRAC, NRAC was authorized to direct BANA's actions. Under these circumstances, BANA would then, in certain cases, commence with foreclosure proceedings on behalf of NRAC. There is no evidence that NRAC ever objected to or otherwise disagreed with BANA's conduct throughout the course of their dealings. In sum, an understanding between the parties that NRAC was to be in control of the undertaking may be implied by BANA's assignment of mortgages to NRAC and BANA's subsequent course of conduct in acting on NRAC's behalf.

### 4. BNYM's ownership of the Loan

Boltz-Rubinstein argues that no agency relationship exists because BANA sold the Loan to BNYM and, hence, "there was nothing for BANA as originator to transfer from itself to NRAC when BANA purported to do so via the post-petition assignment in 2010." Appellant's Br. 38–39, ECF No. 5. But the Loan and the Mortgage are not the same thing. The Loan is the sum of money

15

"lent for the borrower's temporary use," which is evidenced by the Note, while the Mortgage is the instrument that secures the Loan. See Loan, Note, Mortgage, Black's Law Dictionary (11th ed. 2019). Judge Frank found (based on Ms. Golio's credible testimony) that the Loan was sold to BNYM, but BANA retained ownership of the Mortgage until it was assigned to NRAC. Id. App. Volume 1, at 15:10-18.[9] Boltz-Rubinstein offers no authority to support the proposition that the owner of the loan and the owner of the mortgage cannot be two separate entities.

For all of the foregoing reasons, Judge Frank's finding that BANA and NRAC's conduct evidenced an agency relationship is not clearly erroneous. As a result, the Court declines to address Boltz-Rubinstein's reverse piercing argument since that analysis is contained within the estoppel/domination theories that Judge Frank ruled on in the alternative. The Court also declines to address Boltz-Rubinstein's arguments related to

---

[9] Although the Servicing Agreement states that the ownership of the Mortgage would vest in BNYM, the totality of Ms. Golio's testimony and the course of dealing between the parties indicates that the parties intended BNYM to be the beneficial owner of the Mortgage, while BANA would remain the legal owner of the Mortgage. Boltz-Rubinstein seems to suggest that the consequence of this (i.e., allowing BANA to retain record title after selling the Mortgage to BNYM) was to depict continued ownership by BANA and conceal BNYM's ownership in violation of public policy. Boltz-Rubinstein cites no authority for the proposition that such a relationship is against public policy. Although the Servicing Agreement further indicates that BANA's retention of the Mortgage was intended to be in a custodial capacity only, there is no reason why this would impact BANA's legal authority to assign the Mortgage to NRAC, particularly given that the Servicing Amendment explicitly directs BANA to take the deed or certificate of sale in the name of NRAC.

16

damages, as Judge Frank also ruled on those only in the alternative.

## V. Conclusion

For all of the aforementioned reasons, we will affirm the decision of the Bankruptcy Court. An appropriate order follows.